# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-595-TJK** |
| **JAMES RUSSELL DAVIS** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Russell Davis to 8 months' incarceration, 3 years of supervised release, $2,000 in restitution, a $410 fine, and the mandatory $100 special assessment. This is a sentence at low end of the 8- to 14-month range of the advisory guidelines as calculated by the government and the United States Probation Office in the Presentence Investigation Report (PSR).

## I.     INTRODUCTION

The defendant, James Russell Davis, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

On January 5, 2021, Davis, a member of the Virginia chapter of the Proud Boys, spent the night at a campground Northeast D.C. with other Proud Boys before traveling to the National Mall on January 6, 2021. Davis then marched with other Proud Boys and joined the rioters who stormed the West Front of the Capitol. As the police line collapsed, officers retreated towards and established a smaller defensive perimeter guarding an entrance to a set of stairs leading to the Lower West Terrace.

Davis was at the front of the group of rioters as they attempted to breach the defensive perimeter. Davis wielded a long wooden stick as he directly confronted police officers. He first pushed against a police officer's riot shield with his left hand, which was holding the stick. Davis then moved towards a second officer, pushed back against the officer's outstretched baton, put his hand on the officer's shoulder, and yelled at the officer as the officer attempted to repel Davis. Davis only stopped after experiencing an apparent medical issue and collapsing. He later sent a long message to his fellow Proud Boys bragging that he was at the front of the line imploring the rioters to move forward, and claiming that he used his "beefy stick" to force the police to retreat.

**FACTUAL BACKGROUND**

**A.      The January 6, 2021 Attack on the Capitol**

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 45, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

2020 presidential election.

**B.      Davis's Role in the January 6, 2021 Attack on the Capitol**

In the leadup to January 6, 2021, Davis, a resident of King George, Virginia, and a member

of the Virginia chapter of the Proud Boys, posted messages to a Telegram group chat called "PB

Vets," where he went by the username "JD INVINCIBLE." On Christmas Day 2022, Davis

messaged the Telegram group that America was "under attack" and to prepare for battle:



From: 1327043010 JD INVINCIBLE

Gentlemen, this Shit is Getting Real!
America is under attack by Domestic Terrorists! PRAY For AMERICA tonight!
Prepare your Hearts Minds and Soul, as we prepare for Battle to Save America and our Families!
My Sister in Law was in Nashville with her family and are still shook up.
Its not about Antifa BLM punks, this is much deeper and more serious.
I have said my Peace with my Family, I am Prepared if Called! Are you?
JESUS CHRIST is my LORD and SAVIOR!
LOCK AND LOAD! POYB! UHURU!

12/25/2020 7:36:55 PM(UTC-10)

Figure 1, Government's Exhibit 1 at 69[2]

Davis also ironically warned the group not to "put stupid shit in writing":



From: 1327043010 JD INVINCIBLE

There is always someone watching Social Media, DON'T PUT STUPID SHIT IN WRITING!

12/27/2020 5:22:03 AM(UTC-10)

Figure 2, Government's Exhibit 1 at 81

Starting on December 28, Davis used the chat group to communicate his intent to go to

Washington D.C. on January 5th and 6th and "fight for America":

---

[2] All of Davis's recovered chats in the "PB Vets" Telegram group are attached as Government's Exhibit 1.

From: 1327043010 JD INVINCIBLE

I hate to tell Communist BLM Mayor Muriel Bowser that she and her barricades and limited metro is not going to stop the Million PATRIOTS descending on DC Jan 5th and 6th to FIGHT FOR AMERICA and OUR FREEDOM!

12/28/2020 1:10:36 PM(UTC-10)

Figure 3, Government's Exhibit 1 at 94

Davis continued to post daily messages to the group disparaging antifa and praising the Proud Boys.[3] On January 4, 2021, Davis told the group that the former President had given the Proud Boys the "green light" and that it was "time to unleash hell":



From: 1327043010 JD INVINCIBLE

Bad Ass PRESIDENT TRUMP!
1776 REVOLUTION!
GENTLEMEN, I Think PRESIDENT TRUMP just gave every PATRIOT and PROUD BOY the GREEN LIGHT! Time to UNLEASH HELL!
POYB! UHURU!  !

1/4/2021 8:45:29 AM(UTC-10)

Figure 4, Government's Exhibit 1 at 111

In the leadup to the rally, Davis continued to call for violence against law enforcement. On January 4, 2021, Davis posted a link in the chat to a news article referencing the potential deployment of a limited number of unarmed guardsman. Davis commented that the guardsman had been "stripped of their Balls" and that it was going to be a "FUN PATRIOTIC RALLY.[4]" He called the mayor of Washington, D.C. at "COMMUNIST C**T" and referenced the Proud Boy refrain, "FUCK AROUND AND FIND OUT." [5] He delighted in the idea that "100,000

---

[3] *See* Government's Exhibit 1 at 104, 105, and 108.
[4] *Id*. at 112.
[5] *Id*.

PATRIOTS and PROUD BOYS will own DC STREETS."[6]

The day before the rally, Davis again called for violence at the rally on January 6:



From: 1327043010 JD INVINCIBLE

Ther'll be time enough for countin, when the Dealings Done!
LET THE BODIES HIT THE FLOOR!
LET THE BODIES HIT THE FLOOR!
LET THE BODIES HIT THE FLOOOOOORRRRR!
PROUD BOYS HELICOPTER SERVICE! UHURU! !

1/5/2021 3:08:54 AM(UTC-10)

Figure 5, Government's Exhibit 1 at 118

Davis stayed with other Proud Boys at a campground before traveling to Washington, D.C. on January 6. That morning, Davis wore a black and red U.S. Marine Corps baseball cap, sunglasses, a black sweatshirt with a skull and cross bones on the left chest, a black and green gaiter around his neck, black gloves, and a CamelBak-style backpack. He also carried a large wooden stick. Davis travelled with fellow Proud Boys to Freedom Plaza, where they chanted "fuck antifa":[7]

---

[6] *Id.* at 114.
[7] Government's Exhibit 2 at 2:46-3:20.



Figure 6, Government's Exhibit 2 at 3:06

At another point prior to the riot, Davis gave an interview conducted by "Williston Trending Topics News Radio Live." In the interview, he identified himself as a Virginia Proud Boy and said that "the Proud Boys of Virginia will not let communism and Marxism take over our White House or Virginia."[8]

Subsequently, Davis proceeded from the Peace Circle to the Capitol, running on the west lawn, holding his wooden stick in the air:

---

[8] Government's Exhibit 3 at 0:24-0:31.



Figure 7

At approximately 2:28 p.m., the police line holding rioters on the West Front of the Capitol grounds collapsed. Davis was on the front line of the rioters as officers began retreating, including some officers who retreated towards a temporary stairwell leading to the Inauguration Stage, in an area circled below:



Figure 8

At 2:35 p.m., Davis pushed forward, still carrying his wooden stick. As officers retreated,

Davis continued to push forward on the front lines of the rioters, holding his stick with two hands,

as seen on the body worn camera (BWC) of Metropolitan Police Department (MPD) Officer A.S.:



Figure 9, Government's Exhibit 4 at 16:47 (2:35:00 p.m.)[9]

---

[9] The full interaction between Davis and police officers as observed on the BWC of MPD
Officer A.S. can be seen on Government's Exhibit 4 from 16:44-17:48 (2:34:57 pm – 2:36:01
p.m.).

With the police line collapsing, Davis first moved towards an officer with a riot shield, and pushed against the officer's shield with Davis's left hand, which was holding the stick, as seen on the BWC of Officer I.D.:[10]



Figure 10, Government's Exhibit 5 at 11:16 (2:35:27 p.m.)

Davis then moved to his right and confronted MPD Officer I.D., who did not have a riot shield. Officer I.D.'s BWC captured Davis confronting and making physical contact with Officer I.D. As Officer I.D. shouted at Davis to back up, Davis refused Officer I.D.'s commands and continued to push forward:

---

[10] Government's Exhibit 5 from 11:09-11:20 (2:35:20 pm – 2:35:31 p.m.).



Figure 11, Government's Exhibit 5 at 11:17 (2:35:28 p.m.)[11]

Davis shouted at Officer I.D., "I fought for this country! What the fuck are you doing?" As Davis shouted, Officer I.D. attempted to push Davis away using his baton. Davis, rather than retreating, pushed back against Officer I.D.'s baton, as seen below:



Figure 12, Government's Exhibit 5 at 11:22 (2:35:33 p.m.)

---

[11] The entire interaction between Davis and Officer I.D. can be seen on Government's Exhibit 5 from 10:47 – 11:34 (2:34p.m. – 2:35:46 p.m.).

Officer A.S.'s BWC also captured Davis push back against Officer I.D.'s baton and put his right hand on the officer's shoulder:



Figure 13, Government's Exhibit 4 at 17:23 (2:35:36 p.m.)

During this confrontation, Davis continued to yell that he was "military police" and had fought for this country.[12]

Open-source video also caught the moments Davis made physical contact with police officers:[13]

---

[12] Government's Exhibit 5 from 11:13 – 11:28 (2:35:26 p.m. – 2:35:41 p.m.).
[13] *See* Government's Exhibit 6 from 49:03 – 49:26; Government's Exhibit 7 from 1:23-1:46.



Figure 14, Government's Exhibit 6 at 49:11



Figure 15, Government's Exhibit 7 at 1:41

Davis then approached and confronted Officer M.T. as Officer M.T. attempted to stop Davis's advance. Davis pushed up against Officer M.T.:[14]



Figure 16, Government's Exhibit 8, at 15:29 (2:36:01 p.m.)

Davis then stated, "I'm injured," and fell to the ground as other rioters appeared to assist him:

---

[14] The entire interaction between Davis and Officer M.T. can be seen on Government's Exhibit 8 from 15:26 – 15:58 (2:35:58 p.m. – 2:36:30 p.m.).

13



Figure 17, Government's Exhibit 8, at 15:52 (2:36:25 p.m.)

Shortly after Davis collapsed, he sent the "PB Vets" chat group a detailed message about his involvement in the riot. At 3:14 p.m.,[15] Davis bragged that he "pushed the Capitol Police up their emergency stairs," that he was on "the front of the line," and that he had "used the BEEFY STICK to push forward," forcing the police to retreat:

---

[15] The post was made in UDC time. Converted to EDT, Davis made the post at 3:14 p.m.

From: 1327043010 JD INVINCIBLE

JD INVINCIBLE is FUCKING INVINCIBLE! I did hit a few cops on the head with the BIG STICK, but unfortunately lost that beautiful weapon. We pushed forward and pushed the Capitol Police up their Emergency Staircase.

I was moving forward up the stairs when someone fell and like dominoes, I ended up falling on the concrete, hitting my head which knocked me out. When I woke up much later, I thought it was Capitol Police. But it was actually a group of Patriots, and a Combat Medic who were picking me up and Fireman carried me out of the Capitol to an open park, past the tear gas to lean on a tree and recover.

As they carried me out I shouted with all I had left, I AM A VIRGINIA PROUD BOY; MARINE COMBAT VETERAN, I TOOK THE CAPITOL, DONT GIVE UP THE HILL!  I kept shouting this as they fireman carried me through the enormous crowd. And as I recovered leaning on that tree, I continued to share that message with everyone who passed by.

And once I was better a half hour later or more; I saw a FAFO cover and linked up with a Massachusetts PB group of 2 BROTHERS! and was able to not only make it from the Capitol to Farragut West Metro but help an older woman who had an asthma attack. I got her into a hotel and slowed her breathing. The sad fact of her case, she tried to get 2 police at different locations to get help, and they just told her to keep moving and did Not call 9-11! Everyone should be outraged by all of this, especially denying a TRUMP SUPPORTER medical care.

What I do finally remember about the Assault on the Capitol, I was on the front of the line, I kept pointing to my MARINE CORPS cover and patch saying I FUCKING FOUGHT IN IRAQ FOR AMERICA and FREEDOM; WHAT THE FUCK ARE YOU DOING? LET US IN OUR CAPITOL! THIS IS OUR HOUSE! They apologized and said we wish we could. We REPLIED CHARGE! PUSH FORWARD! WHOSE HOUSE? OUR HOUSE!
I also remember at that time getting Pepper Sprayed, wiping it off and pointing to my Marine Corps patch; telling the Cop, I FUCKING EAT TEAR GAS FOR BREAKFAST!  So he sprayed me again, wiped that off, and started singing the MARINE CORPS HYMN! And I heard him say, FUCKING MARINE GAS CHAMBER, as I used the BEEFY STICK  and pushed forward, forcing the Capitol Police in Retreat up their Emergency Stair Case!
My only regrets: not personally breaching inside the Capitol, losing my new beat down gloves removed to get my pulse, my favorite Marine Corps Veteran cover, losing the most important part of my collapsable baton, and sadly losing my BEEFY BIG STICK! It was an HONOR to FIGHT the TYRANNY and Represent the NOVA SONS OF LIBERTY!

1/6/2021 7:14:26 PM(UTC-10)

Figure 18, Government's Exhibit 1 at 132[16]

Davis later texted the group that he was "PROUD OF ALL OUR BOYS."[17]

By the next day, Davis was worried about the law enforcement response to the Capitol riot

---

[16] This message is also detailed in the Statement of Offense, ECF No. 45, at 5.
[17] Government's Exhibit 1 at 132.

and implored his fellow Proud Boys to delete evidence. On January 7, 2021, Davis sent the following text message to another individual:

> EMERGENCY, DOWNLOAD ALL PICS OR ANY MENTION PB, Anything YESTERDAY! ALL SOCIAL MEDIA POSTS ANYTHING PB. EVEN THIS TEXT. DOWNLOAD ONLY TO THUMB DRIVE, HIDE IT!

Figure 19, Government's Exhibit 9 at 26.

He followed up with another message imploring the other individual to "BECOME A GHOST!"[18]

### Davis's Statements and Destruction of Evidence

Following the issuance of an arrest warrant, Davis self-surrendered and invoked his right to counsel. The United States obtained a search warrant for Davis's phone, but the only evidence the government obtained are the two text messages in Government's Exhibit 9. Davis had deleted his Telegram messages, which were later obtained pursuant to a search warrant on the phone of Nicholas Ochs, a fellow Proud Boy who was also a member of the "PB Vets" Telegram chat.[19]

At some point, Davis created a donation page through the website Give Send Go. In his attempt to elicit donations, Davis falsely claimed that he "collapse[ed] into a police officer after running up the grass hill on the Capitol lawn into a cloud of tear gas and mass confusion, which he was doing to give First Aid to a down Vietnam Veteran fellow Marine that he heard had collapsed in the crowd." As of December 2021,[20] Davis had raised $410 through this page. As of the date of this filing, Davis's page appears to no longer be active. It is unclear how much Davis

---

[18] Government's Exhibit 9 at 26.

[19] Ochs was charged in Case Number 1:21-CR-073 (BAH); *See also* Government's Exhibit 1 at 2.

[20] A copy of Davis's donation page as of December 2021 is attached as Government's Exhibit 10.

has raised as a result of these false claims regarding his conduct on January 6.

On October 4, 2023, the Davis was interviewed by the FBI regarding his participation in the January 6, 2021 Capitol riot. Davis, his attorney, and the FBI case agent met in person at Davis's attorney's office, and the undersigned AUSA participated by phone. During the interview, Davis described joining the Virginia chapter of the Proud Boys in October 2020, and that he joined because he was looking for camaraderie and an active group with military veterans. His intent on going to D.C. was only to attend the Stop the Steal rally. Davis stated that he and other Proud Boys came prepared to fight antifa based on his involvement in the November 14, 2020 rally in D.C. where he had observed skirmishes between the two groups.

Regarding the alleged weapons Davis brought to the Capitol, Davis stated that he had originally brought a cane with him to D.C. due to his health conditions, but that it broke while traveling on the D.C. Metro. Davis stated that after his cane broke, another Proud Boy gave him the "beefy" stick but insisted that he only used it as a cane.[21] Davis also admitted to bringing a collapsible baton, but that it never left his holster. Davis lost both items following his collapse on the West Front.

Davis stated that, in the aftermath of January 6, he directed others to delete evidence at the direction of the leaders of the Proud Boys. Davis stated that he deleted his both his Telegram and Parler accounts, which is why they were not found on his phone during the search. Davis denied taking any photos or video on January 6, and that was why there was no multimedia recovered.

Unlike many January 6 defendants, Davis appears to express true remorse for his actions.

---

[21] Although the government does not dispute that Davis may have used the item as a walking cane at some point, none of the videos from January 6 depict Davis using the stick in such a manner.

Davis detailed how his crimes impacted both him and his family, how he is ashamed to have been a member of the Proud Boys, and that he disaffiliated with the group prior to his arrest. More importantly, Davis expressed remorse for how his actions impacted police officers that day. As a former military police officer, Davis appears humiliated that he attempted to exploit this prior experience and to tout it while confronting the police line. Davis does not recognize the person he sees in these videos. Davis's statements and reflection on his actions and their impact appear to be contrite and sincere and weigh in favor of a sentence at the bottom of the advisory guideline range.

## II.     THE CHARGES AND PLEA AGREEMENT

On January 6, 2022, a federal grand jury returned a superseding indictment charging Davis with six counts, specifically, Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation 18 U.S.C. § 1752(a)(2) (Count Three); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Six).

On the eve of trial, on June 15, 2023, Davis pleaded guilty to Count One pursuant to a plea agreement.

## III.     STATUTORY PENALTIES

Davis now faces sentencing on Count One, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report (PSR) issued by the U.S. Probation Office, Davis faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100. In the plea agreement, the parties agreed that the base offense level is 10, pursuant to U.S.S.G. §2A2.4(a). The plea agreement further noted that the government intends to seek a three-level adjustment pursuant to U.S.S.G. §2A2.4(b)(1)(A) because the offense involved physical contact to an officer, but that Davis reserves the right to oppose this adjustment.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

As discussed below, the revised PSR correctly includes the three-level physical contact adjustment. That Guidelines analysis follows:

<u>Count One 18 U.S.C. § 231(a)(3)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact or Dangerous | |
| | Weapon Used[22] | +3 |
| | **Total** | **13** |

The Draft PSR's correctly includes a three-level adjustment for Davis's offense involving physical contact with a police officer. Davis made contact with at least two officers: the officer Davis first encountered holding the riot shield, and MPD Officer I.D. Both open-source and BWC footage show that Davis moved aggressively towards both officers and used his bodyweight and arms to push against them. Davis brandished a large stick[23] in his left hand and used that hand to push against the first officer's riot shield. Davis then moved towards Officer I.D., who had to use his baton to push Davis away. Davis pushed back against Officer I.D.'s baton and put his right hand on the officer's shoulder.   Davis has stipulated to *all* this contact in the Statement of Offense.[24]

Instead of retreating, Davis remained on the front line of rioters and continued to move forward, forcing the police to continue their retreat. It was only during his confrontation with

---

[22] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[23] Alternatively, the Court could also find that Davis committed Civil Disorder while "a dangerous weapon…was possessed and its use was threatened." U.S.S.G. § 2A2.4(b)(1)(A). A "dangerous weapon" means "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun). U.S.S.G. § 1B1.1 Application Note 1(E). Davis's "beefy stick" was an instrument capable of inflicting death or serious bodily injury, and Davis used the stick in a manner that created such an impression.

[24] Statement of Offense, ECF No. 45, at ¶ 12.

Officer M.T. that Davis collapsed. Davis later corroborated the footage of his conduct, bragging to fellow Proud Boy members that "[w]e pushed forward and pushed the Capitol Police up their [e]mergency [s]taircase."[25] Davis told them that he and other rioters yelled out to "CHARGE!" and "PUSH FORWARD," and that he "used the BEEFY STICK and pushed forward."[26] Under these facts, the three-level adjustment is plainly applicable, and the draft PSR correctly applied the adjustment.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. Draft PSR ¶ 46. Accordingly, based on the government's and probation's calculation of the defendant's total offense level, after acceptance of responsibility, at 11, Davis's Guidelines imprisonment range is 8 to 14 months' imprisonment.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Davis's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Davis wielded a large wooden stick, was at the front line of rioters during the police retreat on the West Front, and was particularly aggressive and confrontational, making physical contact with at least two officers before he collapsed, apparently

---

[25] *Id*. at ¶ 14(a).

[26] *Id*.

due to a medical condition. Davis later bragged about his assault on the Capitol and encouraged others to delete and destroy evidence, which Davis appears to have done. The nature and circumstances of Davis's offense were of the utmost seriousness, and fully support the government's recommended sentence of 8 months.

### B.  The History and Characteristics of the Defendant

Davis has no prior arrests or convictions. Despite Davis's consistent invocation of his status as a former Marine, records reflect that he served less than two years in the Marine Corps before being discharged general under honorable conditions. Davis's military records reflect that he received an Article 15 Court Martial for Failure to Obey an Order.   According to Davis, during an assignment he was accused of threatening a fellow soldier with a bayonet, which Davis denies. Draft PSR ¶ 92. Davis later joined the Army National Guard where he served for three years and was deployed to Kuwait. Despite have once been a Marine, and later a National Guardsman, and having been in direct proximity to a combat zone, Davis's public and private representations of being a "Marine Combat Veteran" are somewhat misleading.

For the past decade, Davis has been unemployed and receiving both Social Security and Veteran's disability benefits.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Davis's criminal conduct on January 6 was the epitome of disrespect for the law.

22

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[27] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

Although Davis has accepted responsibility for his criminal conduct on January 6, his statements both before and immediately after January 6 were those of a man prepared for battle. Davis went to the Capitol armed with weapons. Despite being unable to work due to disability, Davis was on the front lines as rioters forced the collapse of the police line, and he continued to help lead the crowd forward. He was only deterred after suffering some type of medical event.

Shortly thereafter, David attempted to glorify his actions, painting himself and his fellow Proud Boys as war heroes; in fact, he stated that his only regrets were his failure to personally breach the Capitol and the loss of his weapons, including a collapsible baton and his "beefy big stick." Davis later encouraged fellow Proud Boys to destroy evidence and appears to have successfully accomplished the same. If not for the failure of a fellow "PB Vets" chat member to

---

[27] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

heed Davis's warning to delete their messages, the Court would not have Davis's statements before it.

At the same time, Davis appears to express honest remorse for his conduct, both to his Pretrial Services officer and to the government. He seems to have genuinely reflected on his actions, and how those actions have impacted himself, his loved ones, and, most importantly, the police officers affected by his crime. The government expects that the Court will make the same conclusion. For that, Davis should be commended.

But Davis's conduct on January 6 was inexcusable and needs to be sufficiently punished. He went to D.C. prepared to engage in violence, he rallied his fellow Proud Boys in the call for violence, he followed through on his cries for action, and then, after his fight was over, reveled in his conduct as if he were a conquering warrior. By his own words, one of his only regrets was his failure to personally breach the Capitol. So, while Davis's words today are far from hollow, they cannot overcome the damage and destruction caused by his actions. A sufficient sentence of incarceration is necessary to provide specific deterrence to Davis that participation in a riot, and specifically his conduct towards law enforcement, can never be justified nor repeated.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[28]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[29]

---

[28] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[29] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Roger Kent Baugh*, 22-cr-208, Judge Bates sentenced the defendant to 12 months' and one day incarceration, along with 24 months of supervised release for a single violation of 18 U.S.C. § 231. Like Davis, Baugh did not enter the Capitol, but was involved in the assault on the Lower West Terrace tunnel. However, he was never on the front line of that fight, and instead remained behind and helped other rioters engage in a "heave ho" against the police line. Baugh was also properly given a three-level adjustment for physically contacting the police (even though he did not personally put hands on an officer), and had the same advisory guideline range as Davis.

In *United States v. Ronnie Presley*, 21-cr-257, Judge Moss sentenced the defendant to 12 months' incarceration and 26 months of supervised release, also for a single violation of 18 U.S.C. § 231. Like Davis, Presley encouraged others to storm the Capitol, and successfully entered the building shortly after the initial breach of the Senate Wing Doors. Presley refused police orders to leave and interfered with police efforts to push people out of the Capitol. He also pulled on a police riot shield. Presley also received a three-level adjustment for physical contact, but due to his criminal history, his advisory guideline range of 10-16 months was slightly higher than Davis's.

Davis case is perhaps most similar to *United States v. Bernard Sirr*, 21-cr-259, who Judge McFadden sentenced to just two months' incarceration and an additional 6 months of home

27

confinement following a guilty plea to a single violation of 18 U.S.C. § 231. Unlike Davis, Sirr did not contest the applicability of the three-level physical contact adjustment, which he earned for entering the LWT tunnel and engaging in a coordinated push against the line of police. Sirr, also a member of the Proud Boys on January 6, was, like Davis, a veteran, having been honorably discharged from the miliary after serving overseas. Prior to his plea, Sirr sat down for a pre-plea proffer with the government, and at the proffer and sentencing, Sirr showed genuine remorse for his conduct. Sirr also had dozens of letters of support, and assisted the government as best he could. Unlike Davis, Sirr also pled shortly after he was charged, did not ask for his case to be set for trial, and did not seek to contest the three-level physical contact Davis continues to dispute. Most importantly, Sirr did not bring any weapons with him to the Capitol, unlike Davis who brought both a "walking" stick and a collapsible baton. Although *Sirr* is a comparable case, Davis simply has not earned the same degree of leniency, where Sirr was allowed to serve most of his sentence on home confinement.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[30] Generally, restitution under the VWPA must "be tied to the loss

---

[30] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Davis must pay $2,000 in restitution, which reflects in part the role Davis played in the riot on January 6.[31] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of June 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Davis's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Draft PSR ¶ 131.

## VII.   FINE

Davis's conviction under Section 231 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18

---

[31] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. Despite Davis having raised just $410 through his online campaign, noting that the money would go towards his retained attorney's fees, Davis misleadingly described his involvement at the Capitol and that he was only on Capitol grounds in order to give aid to a "Vietnam Veteran fellow Marine."[32] Davis should not be able to "capitalize" on his participation in the Capitol breach in this way.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 8 months' incarceration, 3 years of supervised release, $2,000 in restitution, a $410 fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____
Stephen J. Rancourt
Assistant United States Attorney
Texas Bar No, 24079181
601 D Street, N.W.
Washington, D.C. 20530
(806) 472-7398
stephen.rancourt@usdoj.gov

---

[32] Government's Exhibit 10 at 2.